This is a time set for argument in three cases we're going to hear today as well as three submitted. The first, all three of them are Katz Technology. The first two are combined and my understanding is Council wants 13 and 7. Is that correct? Yes, that's correct, Your Honor. Okay. Mr. Pietrantonio? Pietrantonio, Your Honor. Pietrantonio, okay. Please proceed. Thank you very much, Your Honor. Good morning. May it please the Court, my name is Frank Pietrantonio and I'm here on behalf of Ronald A. Katz Technology Licensing. The patent owner of these patents that we'll be arguing about in this first argument, the 285 and the 863 patents. These patents are part of a larger Katz portfolio that has been asserted against many defendants and actually have been the subject of over 200 license agreements. What we have here is litigation that has taken place beginning in the mid-1990s through today ongoing. These patents are still in litigation, but they've been made the subject matter of re-examination at the Patent Office. A key for us here is to understand first what is the invention that Mr. Katz has been working towards or what he described. And that really is what I'll call a multi-dimensional call processing system. It's based on a very intelligent system that's driven by computer programs to provide scripts that can either be automatically played to a caller, or can be provided to an operator to relay to a caller so that call transactions can be made. Mr. Piazza-Antonio, I think we're familiar with the facts and we're familiar with the inventions. Let me try to get to the crux of some of the issues here. The first question I have is why is it not obvious to utilize the advantages of the DNIS technology shown in the BCT86 in combination with Barger? Thank you very much, Your Honor. I'm glad we're cutting to the chase. I think to start with, we have to look at what is required here by the Board in terms of substantial evidence. There's not actually been a description of any advantage that would be gained by having DNIS incorporated into Barger. There have been conjecture that was made by the Board in terms of it would be advantageous. But a specific advantage in terms of what you would gain incorporating a complex DNIS system such as in BCT into a Barger system that already has solved its own problem. But that's not quite the question, I thought. That is, somebody who hadn't built something yet. I take it that the government is saying it's perfectly obvious. You either spend a bunch of money on a lot of physical lines or you use a single line with addressing through the DNIS. Is that the basic choice? Not for somebody who already has an in-place, fully built Barger system, but somebody who is thinking about building something and looking at Barger and knowing about DNIS and saying, I don't need to have 20 lines coming into my computer. Your Honor, I take a step back first to try to put us in the context of what it is that we're looking at here. We're looking at inventions that were developed over 25 years ago and looking at references that are over 30 years old. So it would be easy today to sit back and say it would be obvious to take this piece from BCT, this functionality of DNIS, and substitute it in for a number of different lines. But the question would be at the time, what would be the advantage that a person of ordinary skill in the art at that time would see in taking a unified VRU system such as BCT with all of its attendant costs and complexity and incorporating the cost of DNIS into that and substituting it into Barger? But the DNIS, that's what it is and that's what it does. It's an alternative way of routing calls. Either you can have multiple telephone lines receiving multiple different numbers of calls, or you can have a single, like a T1 line, routed electronically using the DNIS identifier. And it seems to me the BCT86 reference alludes to the fact that using the DNIS allows you to take advantage of low-cost, high-volume services such as T1 and Megacom. That's not what DNIS does. It allows you to use sort of a big bus and have one line coming in and then having everything routed electronically. DNIS and the arrangement that BCT has set out has allowed it to provide a choice between dealing with operators and an automated system and it allows it to handle a large number of calls. That's correct. That's what BCT discloses. I mean, it seems to me the analogy here in terms of this obviousness question is just to find something fairly simple. If you wanted to hang something on a wall, you could use glue and nails. That would be a permanent hanging on the wall. But if you decided, well, wait a second, it might be advantageous for me to be able to remove that at some point. So I'm going to use screws. Why? Because screws have the advantage of being removable. And it's just a matter of design choice, if you will. And you don't need a reference that explains, well, the screw is a helical thing and it comes in and goes out. You don't need a teaching to that extent because it's apparent. That's what it is. And the same thing here. DNIS does what it does. It allows you to take a single line and route it electronically using addresses as an alternative, if you will, to having multiple lines. Am I looking at this the wrong way? I think I understand Your Honor's perspective as it relates to the functionality that DNIS performs. I would say that the question becomes over time, using your analogy about the fasteners, how understandable is it that they solve the same problem and they do it in a way that's advantageous? And I think that the question becomes, is what the board has proposed and what the examiner has proposed and what the patent office has argued sufficient to show that there was some reason, either explicit or implicit, or something beyond simply I might substitute one for the other to motivate somebody to actually make the definition. Let me drill down from the general a little bit with you. In 1138 and page 46 in the opening brief, Katz argues that the Barger automated mode is not a different format than the modified automated mode because the caller can simply hang up and complete the purchase in person at a retail store. Can't the caller simply terminate the same way in 863 and go down and buy at a retail store? Certainly a caller could, in the 863 scenario, decide to hang up and go purchase at a retail store. That's correct. So what's your difference? You say that Barger is in a different format because of that. I'm sorry. I apologize. I was looking at the 1137 brief. While you're doing that, look at page 48, too. I'm sorry, that's in 48 of the joint appendix on 1138. The board found that excluding spontaneous and contemporaneous live exchanges between a caller and a live operator was inconsistent with the specification of the 863 patent. Within 863, if a caller reaches an operator by transfer in claim 27 and utters a pleasantry about the weather, isn't that a spontaneous conversation? Is it excluded? Just as a clarification point, the 863 and the 285 patents deal with the operators in very different manners. In the 285 patent, the operator is disclosed as actually performing a format. They have a scripted scenario that they provide to a customer. In the 863, every reference to the term format has to do with the automated mode that's described in the 863. In the 863, when you go off to an operator, there's nothing in the 863 that suggests that you're going off to a format. So it's completely consistent in terms of being able to go off to an operator in the 863 and have a spontaneous conversation. But I think more important, and still the 863 discloses a format because it all deals in the automated mode. I think we've, in some regards, gone a little bit off course with the use of the term. Is there a spontaneous conversation allowed or is it then automated? I think the focus really needs to be on the construction of the term format itself. You were the ones who steered that course. I'm sorry that we did. I think that what we really need to think about is the definition of the term format and it refers to there being a call processing flow, a call flow, that's implemented by a computer program. The call processing flow implemented by a computer program means it's automated. The computer program brings to the fore its automation. The call processing flow, which has prompts and prerecorded messages, means that there has to be a conveyance of information by way of these prompts and prerecorded messages. There might be some spontaneous conversation that goes on in addition to that. There's going to have to be. But, Your Honor, excuse me, I'm sorry. I didn't mean to interrupt. No, no. But the fact is that that conveyance for there to be a call flow, there must be what amounts to be a script. It can't just be left open to the operator to solicit information in their own manner. That is what we were trying to convey by reference to spontaneous conversation. Of course, the operator might say hello or I hope you're having a wonderful day. But what's critical for the format to be performed is that the operator be told to ask a specific question. Can I please have your social security number? Can I please have your account number? Is that a new argument you're making now? No, it's not, Your Honor. It's consistent with the arguments that we've made all along about the focus having to be on what is a format. And the format is being defined by the call flow and being supported by the computer program. No, no, that's fine. Just a little bit more specifically. Did you argue to the Board that the operator option was not among the formats covered? Yes, we did, Your Honor. I know that the Patent Office has suggested that we waive that argument. There are citations to where it is that we made that argument in our own reply brief in this matter. I can give you some citations. No, no, I saw them. It wasn't clear to me that you actually had made that argument. What's the best place where you said to the Board, in thinking about whether the two formats here exclude the kind of operator? Well, I think the clearest statement would be in the reply brief that was submitted to the Board at 1465, where there's just a flat-out statement, Barger does not disclose a plurality of automated formats, and the focus being on automated formats. But if that's the clearest, it seems to me that's not actually very clear. I would not think that that communicated to the Board that such automation as may or may not exist in the operator situation was not enough. That is, it didn't say there is no automation in the operator situation. It just said, in this kind of very generic way, a requirement of the claim about automated formats is not present. Well, I see I'm moving into some time that I have reserved, but let me just try to quickly answer. I understand that it might be nicer to have had a more detailed, fulsome discussion that lays out in a detailed fashion, as I'd be prepared to talk about why the operator mode isn't an automated mode, but I think it's sufficient to have indicated that we had put in play the notion of there being a determinative factor around format, and that we were required to find automated modes that were not in Barger. And in addition, I would just say, in parallel with the reexamination proceedings, we had ongoing litigation in which this very term was in dispute, and as soon as this Court affirmed a decision about what a format meant, we put that issue in a request for rehearing before the Board specifically, and the Board addressed that issue and didn't deem it waived when, at the very same time, the Board did deem other arguments had been waived. And so I think that's a suggestion that the Board never considered that argument waived, that the Board saw that that was an argument that was propounded. Perhaps it could have been propounded a little bit more clearly, but I think that the Board never considered it waived, even though they thought that other arguments had. And with that, unless there are other questions, I'd like to reserve the rest of my time for rebuttal. You'll have 425. Thank you very much. Mr. Krauss? If it is the Court, whoever invented the idea of touch-tone phones and communicating with processors to get information from customers did something very useful, but that wasn't what Mr. Katz did. That technology was in place even before the Barger patent, which was filed in 1977, over eight years earlier than Katz's earliest patent. What Mr. Katz has done was file a number of claims with a lot of interesting limitations, and the question is, can we find those in the existing prior art, like Barger, Yoshizawa, BCT-86, BCT-87? Just a couple of comments on arguments that Mr. Pietrangelo made. First of all, as we've said in our brief, I think that the argument about whether live operators of format is waived, I also looked at the places in the reply brief. The last thing that he said was that, I may not be getting this right, but that on rehearing, the Board entertained the argument on the merits, which carries possibly an implication that the Board did not think it had been waived. On rehearing, Mr. Katz's technology presented the claim construction that had come from this Court and made a different claim construction argument. He always made the argument in the context of a larger limitation. You can look at the rehearing request. It never once said, and under this definition, a live operator mode is not a format. I certainly couldn't find that in the rehearing request or in any of the sites that we saw in the reply brief. It's not in these pages of the rehearing decision around 32 or so of the… I think the Board might have done some explanation as to why BART or live operator mode was a format. That's been the PTO's position from the outset, but there was never an argument that we're seeing now in the blue brief for the first time about the exclusion of spontaneous conversation, at least not in the 1137 case. That did appear in the 1138, about the exclusion of spontaneous conversation and this import that he gives to the plural of prompts and messages provided. I'm almost reluctant to make this waiver argument because I think this live operator mode argument is very weak in the first place for the very reasons that my colleague states. The very live operator format in the 285 patent, as he says, and he says it very clearly in the reply brief on page 7, is this idea, I guess, of a scripted conversation for the operator to elicit information from the caller and that's exactly what the Barger patent does. The Barger patent repeatedly describes the live operator as being under control of the processor. It describes the call process flow which involves the live operator and I've got it reproduced on page 12 of my brief, that call process flow. That's a computer program and that's why it meets the definition of format even as articulated by the Federal Circuit, which was affirming a district court opinion, which was a definition that the examiner already applied. So we have considered this issue, it is a format, but nevertheless we feel it's our obligation to say he waived it. I'm not sure it's especially important or maybe it is, but did this court in the decision that quotes the large definition of format actually rule on the correctness of that or just assume it because nobody had challenged it? When I read it, I see it as the latter and I agree with you. I'm not sure what the significance of that is.  It's only of a written description issue as to the 120 patent, which doesn't even involve live operators. So I think there's a fair question whether it would apply to the 285 patent. And the 120 doesn't have some of that specification material that actually talks about operator formats, is that right? Correct. It doesn't. And so that's interesting. He can come back and say, well, the district court was looking at a whole bunch of patents, including the 285. This is a repetition of the district court opinion, but the federal circuit never looked at the 285 patent and said, yes, this is the format. But again, even if it is, I think the live operator mode in Barger is every bit as much a format as what we see in Katz. There are a number of other limitations. I think our brief covers them all. I don't think they haven't really been discussed with opposing counsel yet, so I hesitate to open any cans of worms here, but I don't think there are any. Can I just actually ask something maybe that I think Judge Lynn was discussing earlier, and that is on the question of a motivation to use the dialed number identification signals instead of multiple lines. Did the boards just say that anybody would have thought of that without citing something, or did it cite anything, including the passage in, what is it, VCT 86, that says you could use a T1 line instead of lots of copper lines? It certainly cited the passage of VCT that said use of DNIS was crucial for what we're trying to do in VCT, and it also cited simply KSR for the proposition that this is simply a way, it's a known method of improving a prior art device which would work on the same device. That's a conclusion. Now, what's the basis for that conclusion? Well, the basis for that conclusion is they're almost identical systems. In other words, VCT gets incoming calls and either gives them to a machine to process or gives them to a live operator to process. Varga gets incoming calls, either gives them to a machine, gives them to a live operator. VCT has used this existing technology, DNIS, to make it work even better, as you suggested, there's only one line coming in with digital signals as opposed to multiple lines which are somehow distinguished by Varga, and I lost my train of thought, but Varga and VCT are essentially the same thing. Are you saying that the two techniques are essentially alternative arrangements and it's a matter of design choice? Yes, it would only be if somebody was not even aware of DNIS that they wouldn't think to use it naturally in a system like Varga, and VCT is almost exactly like Varga, so that teaches the use of DNIS in that system to distinguish that kind of call. Is there anything in the record, I know there was a declaration submitted, I believe, by Mr. Klein, is there anything that suggests that, no, no, no, it wouldn't have been obvious to use a DNIS because it presents this obstacle or that hurdle? No hurdles. There are these references to the extra cost. In other words, as my adversary was saying, if you were looking at Varga from day one, you wouldn't necessarily want to rip up those lines and replace them with DNIS, and there's a service charge on DNIS, but there's no technical obstacle, especially if you're designing something from scratch. I think in the context of considering a 103 rejection, an obviousness rejection, we're not talking about sort of deconstructing an existing reference in order to reconstruct, and we're talking about teachings and suggestions and what one of ordinary skill in the art would have appreciated. So I'm not sure the cost in the sense of sort of what it would cost to disassemble a system that had multiple lines is a factor. I agree. That's the argument that they're making, and we're resisting it because we think it's really a question, would you start from scratch? You know you have to send some calls to an operator, some to a machine. What will you use? Oh, I can use separate lines. Or, hey, here's a service DNIS using VCT that does the same thing, and then you'll build the record company behind that. If there are no further questions, the red brief does go through all the different limitations that are argued in both cases. If there's any interest in the modified automatic format, 1138, I've got answers for that, but I think it's all quite clearly in the red brief. Thank you. You've got 425. Thank you very much. First of all, I'd like to address the question of whether or not there are scripts in the BARGR as it relates to the operator mode. And I think that there's no question that there's a call flow that's described in BARGR. In figures 3A and 3B, it sets forth what an operator's interactions would be. BARGR admittedly indicates that there's a computer program there, Every time that BARGR refers to what the operator's actions will be, it talks about the computer program asking the operator for things, not asking questions, not presenting prerecorded messages, not providing a script. A format is something more than simply a call flow. It's something more than a computer program. It's the definition that we have there with a call flow that's implemented by a computer program that sets forth the steps, the sequence, and the prerecorded messages that are going to be conveyed during the course of the transaction. BARGR's operator mode doesn't have that. What did you say that the computer does in communicating with the operator in BARGR? I'm sorry, I was talking about in the operator mode, not the automated mode. Yes. In the operator mode, the operator interacts with the caller, and the computer indicates in the specification, all that BARGR indicates is that the computer indicates to the operator, does the customer want something? Does the customer want to place an order? It doesn't present a script. It doesn't tell them what the prerecorded message would be. If I understand what you just said, and maybe I don't, does that question from the computer to the operator amount to a script that says, I need you to tell me if the customer wants something, and so the operator says, I think they're very different given what CATS was trying to accomplish specifically, which is if you look in the 285 patent, where you're talking about having a multi-port processor that has multiple formats on it, a given operator could be responsible for handling multiple diverse formats, and as a consequence, having a very specific script about what you want the operator to say is important. In the BARGR system, there's no description other than the sense of trying to convey some music to somebody who's a customer and making a purchase. There's no other description in there that would tell you what the specifics of the interaction ought to be, and no definition to the operator of what to say. Is it a script to ask him if he wants to buy this? It could be a script if it's understood that if the computer says, does he want to buy this, yes or no? It's different if the computer says, does he want to do it? If the computer says, ask the person if. Doesn't it necessarily imply when you say, does he want to buy this, that the operator needs to find out? In which case, in BARGR, the operator could engage in some sort of conversation without specifically asking the particular question, yes. But having a format that asks the specific question is what it is that we're really driving at with these call processing flows. I guess I just wanted to touch on the automated mode. We haven't talked about the automated mode and the differences that exist between the second and the third mode. I have about 20 seconds. Our only point there that I'd like to emphasize is there's a unity of description of the second and the third modes. The only difference referred to in the specification has to do with the hardware that's used to access those modes. And on that, I think my time has just about expired. Thank you very much. Thank you, counsel.